IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2002

## STATE OF TENNESSEE v. MELISSA D. HAYMAN

**Appeal from the Circuit Court for Blount County**
**Nos. C-12849, 50, 52     D. Kelly Thomas, Jr., Judge**

_____

**No. E2001-01600-CCA-R3-CD**
**September 26, 2002**
_____

A jury convicted the Defendant, Melissa D. Hayman, of aggravated burglary, aggravated assault, and aggravated kidnapping. The trial court sentenced the Defendant as a Range I standard offender to six years each for the burglary and the assault convictions, and to twelve years as a Range I violent offender for the kidnapping. The six year sentences were ordered to be served consecutively to the twelve year sentence and to each other, for an effective sentence of twenty-four years. All of the Defendant's sentences were ordered to be served in the Department of Correction. In this direct appeal the Defendant contends that the kidnapping conviction violates her constitutional rights under State v. Anthony, and further challenges the length and manner of service of her sentences. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Mack Garner, Assistant District Public Defender, Maryville, Tennessee, for the appellant, Melissa D. Hayman.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Mike Flynn, District Attorney General; and William Reed, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The victim in this case, Kimberly Beth Slater, testified that on the morning of July 29, 2000, she was home with her twenty-one month old daughter, who was asleep. Ms. Slater's husband was away at a golf game. Hearing someone knocking on the door leading from the attached garage into the house, Ms. Slater went to investigate. She opened the door into the garage and noticed that the garage door was closed. This was "weird," she testified, because it was her and her husband's

routine at that time to leave the garage door open to accommodate the family dog. Noticing nothing else amiss, she closed the door.

Still wondering what was going on, Ms. Slater subsequently returned to the door leading into the garage and turned the doorknob. At that point, she testified, someone pushed the door in. Ms. Slater tried to close it, but the intruder's arm prevented the door from closing. The intruder then pushed the door open with so much force that the doorknob dented the Sheetrock behind the door.

Ms. Slater testified that the intruder was wearing a mask, but that she immediately recognized the intruder as one of the women who had done some painting in her house. Although she did not know the woman's name at the time, she later identified the Defendant from a photo array and also identified her at trial. Ms. Slater testified that, upon entering the house, the Defendant threatened her with a knife and demanded money. The Defendant then grabbed Ms. Slater by the neck and held the knife to her belly, saying "If you want to keep that baby you're carrying, bitch, you're going to give me your money." Ms. Slater was approximately four months pregnant at the time, and her midriff was exposed.

Ms. Slater told the Defendant she could have the money and credit cards in her purse, explaining that she had less than twenty dollars. When the Defendant heard how little money Ms. Slater had, the Defendant stated, "That's not going to be enough," and called out as though to an accomplice in the garage to come in and get the victim's child. Ms. Slater told the Defendant that her purse was in the bedroom, and the two women went to that room, with the Defendant holding Ms. Slater in a headlock. The Defendant then forced Ms. Slater face down upon the bed and held the knife against the back of her neck. Ms. Slater became afraid that the Defendant was going to sever her spinal cord; at that point, Ms. Slater testified, she decided to fight back.

Ms. Slater reached up, wrenched the Defendant's wrist, and stood up. The two women struggled, falling against the dresser. During the struggle, the Defendant's mask was removed. Ms. Slater got the knife and the Defendant told her, "I swear to God, bitch, you cut me, I'll kill you!" Ms. Slater told the Defendant that she would not harm her if the Defendant would leave the house. The Defendant continued to hold Ms. Slater in a headlock and began hitting her with a claw hammer. Ms. Slater testified that the Defendant struck her three times in the back of her head with the hammer. The Defendant then bit Ms. Slater on her breast, at which point Ms. Slater hit the Defendant with her fist on the Defendant's ear.

Ms. Slater then grabbed the Defendant by the hair and the two women wrestled each other into the kitchen. Here, Ms. Slater threw the knife into the garbage disposal in the sink. The struggle continued with both women grappling for control of the hammer. The struggle continued through the dining room into the living room, where Ms. Slater attempted repeatedly to eject the Defendant through her front door. She testified that every time she managed to get the door unlocked and open, the Defendant would close and lock it. This happened over and over, Ms. Slater testified.

Finally, according to Ms. Slater, the Defendant became tired and winded and began apologizing to Ms. Slater. The Defendant began crying and explaining that she needed money for her sick child and that the Defendant's mother was trying to take her children away. Ms. Slater began talking to the Defendant in an effort to calm her down. The two women moved into the living room and sat down, still "locked together" and still both holding onto the hammer. Ms. Slater eventually got the Defendant to agree to leave. Because the Defendant wanted to retrieve her things, they returned to the kitchen, where the Defendant retrieved her knife and lay down the hammer; the women then returned to the bedroom where the Defendant retrieved her mask and a baseball cap. Ms. Slater then requested the Defendant to leave by the front door, but the Defendant refused, stating she had left some things in the garage. The women then went back through the house to the door through which the Defendant had initially entered. During this time, they continued to hold onto one other.

Both women went out the door together into the garage, and the Defendant told Ms. Slater to shut the door. Ms. Slater did so, knowing that they would then be locked out of the house. The Defendant picked up a plastic bag containing an aerosol can and told Ms. Slater she wanted to go back into the house so that she could leave by the front door. Ms. Slater explained that they were locked out, and hit the garage door switch to raise the door. Hearing that she could not get back into the house, the Defendant, according to Ms. Slater, "went nuts." Every time Ms. Slater hit the switch to raise the garage door, the Defendant hit it again to lower the door. The Defendant then attempted to attack Ms. Slater with the aerosol can, which Ms. Slater disarmed by pulling off the nozzle. The Defendant finally let go of Ms. Slater and ran to the side of the garage where there was a fireplace hearth set containing a poker. Free at last, Ms. Slater ran out of the garage and screamed at a neighbor to call 911. At that point, the Defendant finally drove off. Ms. Slater testified that the incident lasted thirty to forty minutes.

The police arrived and took photographs of Ms. Slater's multiple injuries and collected some hair from near the front door as well as the hammer. The Defendant's sister subsequently found, in the Defendant's residence, the knife used in the attack, and turned that over to the police. The shirt that the Defendant had been wearing during the attack was also located and turned over to the police, and blood stains on it matched a blood sample taken from Ms. Slater. The hair found at Ms. Slater's front door was analyzed and matched that of the Defendant.

The Defendant gave a videotaped statement to the police, which was introduced at trial. During her statement, the Defendant asserted that, the night before the incident, she "snapped" due to extreme stress and could not remember anything about the alleged attack. She acknowledged that she knew Ms. Slater, but stated that she had no memory of attacking her.

## ANALYSIS

The Defendant's sole challenge to her convictions arises from our supreme court's opinion in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In Anthony, our supreme court addressed "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." Id. at 300. The court's concern was

whether, under Tennessee's constitutional guarantee of due process, an accused's actions during a single criminal episode could support separate convictions for both kidnapping and an accompanying felony such as robbery or rape, both of which necessarily involve some confinement against the will of the victim. The court set forth the issue as "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Id. at 306.

In the subsequent case of State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), our supreme court set forth a two prong inquiry for the determination of this issue. The first prong requires us to decide "whether the movement or confinement [of the victim] was beyond that necessary to consummate" the accompanying felony. Id. at 535. If so, the second prong requires us to examine "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. We note that, in Dixon, our supreme court stated that "any restraint in addition to that which is necessary to consummate [the accompanying felony] may support a separate conviction for kidnapping." Id. (emphasis added).

In this case, the Defendant contends that her aggravated kidnapping conviction cannot stand because any detention or confinement of Ms. Slater was incidental to the aggravated assault.[1] We respectfully disagree. The Defendant was indicted for, and convicted of, aggravated assault with a deadly weapon.[2] See Tenn. Code Ann. § 39-13-102(a)(1)(B). Upon entering Ms. Slater's home, the Defendant grabbed Ms. Slater and held a knife to Ms. Slater's belly. Medical testimony established that Ms. Slater suffered several knife wounds to her abdomen. The Defendant then forced Ms. Slater into the bedroom, still holding the knife to Ms. Slater's abdomen, and forced her to lie face down on the bed. The Defendant then held the knife to Ms. Slater's neck. A struggle ensued, during which the Defendant struck Ms. Slater several times with a hammer after having been disarmed of the knife.

The Defendant's movement of Ms. Slater to the bedroom, and the Defendant's confinement of Ms. Slater to a face-down prone position on the bed, were neither necessary nor incidental to the Defendant's attacks upon Ms. Slater with the knife and the hammer. That is, the Defendant's movement of Ms. Slater to the bedroom, and the Defendant's confinement of Ms. Slater there, was not necessary for the commission of the aggravated assault. Cf. Dixon, 957 S.W.2d at 535 (the accused's movement of the victim to the back of a vacant lot was not necessary for commission of the aggravated assault, and therefore supported a separate kidnapping conviction). Furthermore, moving Ms. Slater to the bedroom and forcing her to lie face-down on the bed increased Ms. Slater's

---

[1]An aggravated kidnapping is committed when the accused falsely imprisons someone while in possession of a deadly weapon. See Tenn. Code Ann. § 39-13-304(a)(5). An accused falsely imprisons someone by knowingly removing or confining the victim unlawfully so as to interfere substantially with the victim's liberty. See id. § 39-13-302(a).

[2]The indictment listed as the deadly weapons, "a knife and a hammer."

risk of harm, rendering it more difficult for Ms. Slater to evade the Defendant's weapons. Accordingly, we conclude that the Defendant's dual convictions for aggravated assault and aggravated kidnapping do not offend Tennessee's constitutional due process provisions as set forth in <u>Anthony</u> and its progeny, and this issue is therefore without merit.

## SENTENCING

The Defendant next contends that the trial court erred in applying certain enhancement factors to her sentences, erred in ordering her sentences to be served consecutively, and erred in finding her ineligible for community corrections. When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a <u>de novo</u> review of the sentence with a presumption that the determinations made by the trial court are correct. <u>See</u> Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a <u>de novo</u> review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. <u>See</u> Tenn. Code Ann. §§ 40-35-102, -103, -210; <u>State v. Brewer</u>, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); <u>State v. Thomas</u>, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. <u>See State v. Pike</u>, 978 S.W.2d 904, 926-27 (Tenn. 1998); <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The burden of demonstrating that the sentence is erroneous is upon the appealing party. <u>See</u> Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The Defendant was convicted of aggravated burglary, a Class C felony; aggravated assault, a Class C felony; and aggravated kidnapping, a Class B felony. <u>See</u> Tenn. Code Ann. §§ 39-14-403(b), 39-13-102(d), 39-13-304(b)(1). The presumptive sentence for Class B and C felonies is the minimum in the applicable range, increased as appropriate for applicable enhancement factors,[3] and decreased as appropriate for applicable mitigating factors. <u>See id.</u> § 40-35-210(c), (e). The trial court sentenced the Defendant as a Range I standard offender to the maximum terms of six years for the aggravated burglary and aggravated assault convictions. <u>See</u> Tenn. Code Ann. § 40-35-112(a)(3).

---

[3]Enhancement factors are not applicable if they are themselves essential elements of the offense. <u>See</u> Tenn. Code Ann. § 40-35-114.

In imposing the maximum terms, the trial court relied on four enhancement factors: that the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; that the personal injuries sustained by the victim were particularly great; that the Defendant had no hesitation about committing a crime when the risk to human life was high; and the crime was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(1), (6), (10) & (16). The court relied upon the Defendant's admission at the sentencing hearing of significant cocaine use for the application of the first of these factors. The trial court found that the victim suffered particularly great psychological injuries based on the victim's testimony at the sentencing hearing and her therapist's diagnosis of severe post-traumatic stress syndrome. With respect to the last two enhancement factors applied, the court relied on the fact that the victim was pregnant and the attack threatened the viability of the fetus as well as the victim's life. The trial court applied no mitigating factors.

The Defendant does not challenge application of the first factor. She does, however, challenge the application of factors (6) and (10).[4] The State argues that the trial court's application of the enhancement factors was correct.

We first analyze application of the challenged enhancement factors to the Defendant's conviction of aggravated burglary. A written report from Linda S. Pucci, a psychologist who treated the victim for eight sessions after these offenses, was admitted into evidence at the sentencing hearing. This report indicates that when Dr. Pucci began treating Ms. Slater a few days after the crimes, Ms. Slater "was displaying the classic symptoms of Acute Post-traumatic Stress Disorder." The report describes Ms. Slater as "nervous and fearful, unable to sleep, watchful of someone breaking in, [having] almost continual intrusive thoughts about the crime, [and] replaying it over and over in her mind. . . . In addition, she struggled with thoughts of 'what might have happened' to herself, her unborn child, and to her toddler if she had not fought back her assailant. She was quite anxious about the outcome of her pregnancy as a result of the assault." Ms. Slater's own testimony at the sentencing hearing affirmed these effects. This evidence is sufficient to establish "particularly great personal injures" as contemplated by enhancement factor (6). See State v. Arnett, 49 S.W.3d 250, 260 (Tenn. 2001) ("application of this factor is appropriate where there is specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from this offense.")

We now consider the applicability of enhancement factor (10) to the Defendant's conviction of aggravated burglary. Factor (10) requires a finding that the Defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(10). In this case, the Defendant forcibly intruded into the victim's home, knowing that she and her young child were there, brandishing a knife and, later, a hammer. A high risk to human life is not an essential element of the crime of aggravated burglary See id. § 39-14-403(a). Accordingly, we hold that the trial court properly applied this enhancement factor to the Defendant's sentence for

---

[4]The Defendant makes no reference to the trial court's application of factor (16).

aggravated burglary. Also, although not challenged by the Defendant, we further find appropriate the trial court's application of factor (16), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. As with factor (6), a great potential for bodily injury to a victim is not an essential element of aggravated burglary. See id. Because of the manner in which the Defendant committed the aggravated burglary in this case, however, application of this factor is appropriate.

The Defendant also contends that the trial court should have found as mitigating factors that her prior criminal record is "almost negligible," she has worked steadily since dropping out of high school, has no history of violence, and is supporting two small children. We respectfully disagree. While the Defendant has few criminal convictions, she admitted at the sentencing hearing to significant cocaine use, including while she was out on bond awaiting trial. Also, one of the Defendant's witnesses at the sentencing hearing testified that the Defendant had stolen $100 from her just days before trial. The Defendant is therefore not entitled to a reduction in her sentence on this basis. With respect to the Defendant's work history and parenting responsibilities, we acknowledge that defendants are "normally . . . due some favorable consideration based upon . . . family contributions and work ethic." State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994). See also State v. Kelley, 34 S.W.3d 471, 482-83 (Tenn. Crim. App. 2000). In this case, however, the Defendant used her work as the avenue of attack, rendering questionable the value of her claimed work ethic. Moreover, the Defendant's use of cocaine is clearly not appropriate behavior for a parent of small children. In short, the Defendant was due little, if any, mitigation on these bases, and we therefore decline to find that the trial court erred in refusing to reduce the Defendant's sentence. In sum, the trial court's imposition of the maximum sentence for the Defendant's aggravated burglary conviction was proper, and this issue is without merit.

We turn now to the application of the enhancement factors to the Defendant's aggravated assault conviction. Application of factor (1) is appropriate and not challenged by the Defendant. Application of factor (6) -- that the victim's injuries were particularly great -- is also appropriate. Not every aggravated assault results in acute post-traumatic stress disorder, and the proof here, as set forth above, established that the victim's psychological injuries from the attack were "particularly great." With respect to factor (10), we note that every aggravated assault with a deadly weapon includes a high risk to human life. Nevertheless, we agree with the trial court that this factor is applicable under the facts of this case because the victim was pregnant, and the life of the fetus was also at high risk. We note the Defendant was aware that the victim was pregnant, as evidenced by the threatening language the Defendant used regarding the "baby you're carrying." The risk to an unborn fetus is not necessarily present in every aggravated assault with a deadly weapon and is therefore, we find, properly applied in this case.[5]

---

[5]We acknowledge that our legislature has determined that only viable fetuses may be victims of assaultive offenses and criminal homicides, see Tenn. Code Ann. §§ 39-13-107(a), 39-13-214(a), and that there was no proof concerning the viability of the fetus carried by the victim in this case. However, we do not view our finding that enhancement factor (10) is properly applied in this case on the basis of the victim's pregnancy to be in conflict with those statutory provisions. Rather, we consider the legislature's use of the term "human life" in this particular enhancement

(continued...)

However, we find that the trial court erred in applying factor (16), that the Defendant's commission of the aggravated assault created a great potential for bodily injury to a victim. A great potential for bodily injury to the victim of an aggravated assault with a deadly weapon is present in every such offense. Accordingly, this enhancement factor cannot be applied with respect to the attack upon Ms. Slater, and the trial court correctly refused to so use this factor. Instead, the trial court applied this factor based on the great potential for bodily injury to Ms. Slater's unborn child. However, our supreme court has recently held that, where the defendant is convicted of an offense involving a specific, named victim, such as aggravated assault, this factor cannot be used to enhance the sentence on the basis that there were other potential victims. See State v. Imfeld, 70 S.W.3d 698, 706-07 (Tenn. 2002). The court reasoned that "[t]here is nothing in the statutory language of . . . enhancement factor [number 16] to indicate that it applies to potential victims or that it applies simply because the offense was committed in the presence of other individuals." Accordingly, the Defendant's sentence for aggravated assault should not have been enhanced by factor (16) on the basis that the offense created a great potential for bodily injury to Ms. Slater's unborn child.

Nevertheless, we find that the trial court's imposition of the maximum sentence for the Defendant's conviction of aggravated assault is proper based on enhancement factors (1), (6) and (10), and this issue is therefore without merit.

We turn now to the Defendant's aggravated kidnapping conviction. The trial court sentenced the Defendant to the maximum term of twelve years for this felony. See Tenn. Code Ann. §§ 39-13-304(b)(1), 40-35-112(a)(2). In doing so, the trial court relied upon the same four enhancement factors set forth above. Again, the Defendant does not challenge the applicability of enhancement factor (1). We find that the trial court properly applied enhancement factor (6) for the same reasons set forth above: not every aggravated kidnapping results in acute post-traumatic stress disorder. We further find that the application of factor (10) is appropriate under the facts of this case for the same reason it is appropriate with respect to the aggravated assault conviction. An aggravated kidnapping accomplished with a deadly weapon necessarily involves a high risk to the victim's life; here, however, it also involved a high risk to the victim's unborn fetus. Application of this factor was therefore appropriate in this case. However, we find that under Imfeld, the trial court erred in applying factor (16) on the basis of the great potential for bodily injury to Ms. Slater's unborn child. Nevertheless, we hold that the trial court's imposition of the maximum sentence for the Defendant's conviction of aggravated kidnapping is proper based on enhancement factors (1), (6) and (10). Accordingly, this issue is without merit.

---

[5](...continued)

factor to be broad enough to encompass the potential human life inherent in all pregnancies. See Planned Parenthood v. Sundquist, 38 S.W.3d 1, 17 (Tenn. 2000). We note that, in the other enhancement factors focusing on the effect(s) of the offense on others, the legislature used the terms "victim" and/or "person." See Tenn. Code Ann. § 40-35-114(3), (4), (5), (6), (7), (11), (12), (16), (18), (19). The much broader term "human life" indicates, we think, the legislature's intent to enhance the punishment of those who engage in activities that threaten not only the victim's life, but the expectant human life inherent in the victim's pregnancy, at least where the defendant is aware of the pregnancy.

The Defendant also argues that the trial court erred in ordering her sentences to be served consecutively to one another, for an effective sentence of twenty-four years. When a defendant is convicted of more than one criminal offense, the trial court may order the sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). The trial court found the Defendant in this case to be such a dangerous offender. In making this finding, the trial court noted the duration of the Defendant's attack upon the victim and the Defendant's repeated refusal to disengage the attack and leave the house, going so far as to repeatedly close doors that were opened by the victim. The trial court also found the Defendant's testimony at the sentencing hearing, which differed markedly from her statement to the police and her statement to the probation officer who prepared the presentence report, "totally false" and concluded that her "untruthfulness [indicates] that the chances for rehabilitation are zero." The trial court also found not credible the Defendant's testimony that she wanted treatment for her drug abuse, stating that, had she wanted treatment, she would have sought it while on bond rather than continuing to use cocaine until shortly before trial.

We note that the trial court did not make the specific findings on the record required by State v. Wilkerson for the imposition of consecutive sentencing based on a determination that the defendant is a dangerous offender: "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). We hold, however, that the facts adduced at the trial and the sentencing hearing support such findings. We are mindful of this Court's holding in State v. Alexander, 957 S.W.2d 1 (Tenn. Crim. App. 1997), in which the defendant was convicted of attempted first degree murder and theft for his invasion of the victim's home while abusing cocaine, and his attack on the victim with a knife and claw hammer. The trial court imposed consecutive sentences on the basis that the defendant was a dangerous offender, but did not make the additional Wilkerson findings. This Court nevertheless affirmed the consecutive sentences, finding that

> [the] defendant committed the very acts which place citizens in the greatest fear: he broke into a home in the middle of the night for the purpose of stealing personal property and, in the midst of his theft, viciously attacked the unarmed resident, doing his best to hammer and stab her to death. These offenses were very severe and warrant long terms of confinement. Moreover, that the defendant may have been high on crack cocaine at the time he committed these heinous deeds only heightens the danger that, once he has access to cocaine again, he will commit similar crimes. The public not only needs to be protected from a defendant willing to commit these sorts of crimes: it deserves to be so protected.

Alexander, 947 S.W.2d at 8. The same overall considerations and analysis apply to this case. The trial court's imposition of consecutive sentences for the Defendant's crimes is proper, and this issue is without merit.

Finally, the Defendant contends that the trial court erred in finding her ineligible for placement on community corrections. The Community Corrections Act was meant to provide an alternative means of punishment for "selected, nonviolent felony offenders . . . , thereby reserving secure confinement facilities for violent felony offenders." Tenn. Code Ann. § 40-36-103(1); see also State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998). Pursuant to statute, persons who satisfy all of the following minimum criteria are eligible for participation in a community corrections program:

> (1) Persons who, without this option, would be incarcerated in a correctional institution;
> (2) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
> (3) Persons who are convicted of nonviolent felony offenses;
> (4) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
> (5) Persons who do not demonstrate a present or past pattern of behavior indicating violence; [and]
> (6) Persons who do not demonstrate a pattern of committing violent offenses[.]

Tenn. Code Ann. § 40-36-106(a). Additionally, persons who do not otherwise satisfy the minimum criteria and who would usually be considered unfit for probation due to histories of chronic alcohol abuse, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community may be considered eligible for participation in a community corrections program. Id. § 40-36-106(c).

The Defendant concedes that she does not satisfy the minimum criteria for placement on community corrections, but argues that she is eligible on the basis that her drug abuse is a "special need." The State argues that, because the Defendant's conviction of aggravated kidnapping renders her statutorily ineligible for probation,[6] she is per se ineligible for community correction. See Tenn. Code Ann. § 40-36-106(c); State v. Staten, 787 S.W.2d 934, 936-37 (Tenn. Crim. App. 1989). Initially, we note that a twelve-year sentence may not be served on community corrections on a "special needs" basis. See Tenn. Code Ann. §§ 40-36-106(c), 40-35-303(a); see also State v. Boston, 938 S.W.2d 435, 438-39 (Tenn. Crim. App. 1996); Staten, 787 S.W.2d at 936. Furthermore, the trial court in this case imposed consecutive sentences on the Defendant upon determining that she was a dangerous offender. We have affirmed the trial court's ruling in that regard. As set forth above, community corrections is intended as an alternative to incarceration for "selected, nonviolent felony offenders." Tenn. Code Ann. § 40-36-103(1). A dangerous offender is one who, by definition, does not meet the baseline requirement for community corrections that he or she be a "nonviolent"

---

[6]See Tenn. Code Ann. § 40-35-303(a).

offender. Accordingly, the trial court did not err in refusing to consider the Defendant for community corrections, and this issue is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE